IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELO THOMAS MENUTO, II, | ) | |
| Plaintiff, | ) | Civil Action No. 11-264 |
| | ) | |
| v. | ) | Judge Sean McLaughlin |
| | ) | Magistrate Judge Susan Baxter |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

## II. REPORT

### A. INTRODUCTION

Angelo Thomas Menuto, II ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 7, 10).

**1.     General Background**

Plaintiff filed for DIB and SSI on December 16, 2009, claiming a disability onset date of December 2, 2005.[1] (R. at 13). He alleged an inability to engage in full-time employment as a result of limitations stemming from obsessive compulsive disorder ("OCD"), anxiety, and panic attacks. (R. at 148). Plaintiff was born on January 4, 1981, and was thirty[2] years of age at the time of his administrative hearing. (R. at 31). Plaintiff completed the eleventh grade, but did not obtain his GED and had no post-secondary education. (R. at 33). Plaintiff last worked full-time in 2004-2005 as a computer repairman. (R. at 36). Since that time, Plaintiff occasionally helped his father with his real-estate business. (R. at 203, 205). Plaintiff lived with his father and subsisted on food stamps and welfare benefits. He also received health insurance through the state. (R. at 33-34).

**a.   Adult Function Report**

In February 2010, Plaintiff completed an Adult Function Report outlining his daily activities and physical limitations. (R. at 159-66). Plaintiff lived a reclusive lifestyle, spending a typical day inside watching television. (Id.). Plaintiff stated that he was capable of personal care, cooking, cleaning laundry, leaving the apartment two or three times per week, traveling independently, driving a car, and shopping two or three times a month for necessary items. (Id.). His father took care of his finances. (Id.).

---

[1] Plaintiff previously filed for DIB and SSI on December 15, 2005, claiming a disability onset of December 2, 2005. (ECF No. 5-3 at 58 (Citations to ECF Nos. 5 – 5-8, the Record, *hereinafter*, "R. at __")). Plaintiff's claim was denied in a decision dated December 10, 2007. (R. at 55). Plaintiff appealed this decision, but his request for review was denied by the Appeals Council. (R. at 65). Plaintiff did not thereafter file a complaint in the United States District Court. As such, Plaintiff is estopped from asserting that his disability began prior to the Commissioner's first decision. The relevant period under consideration therefore begins the following day, December 11, 2007.

[2] Plaintiff is defined as a "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

Plaintiff alleged that he had difficulty with scheduling activity outside his home due to anxiety and panic. (Id.). His sleep was often interrupted by anxiety. (Id.). Completing tasks, concentrating, and following instructions was a challenge. (Id.). He felt that he was not able to interact well with authority figures, that he did not handle stress well, and that he could not handle changes well. (Id.). OCD behaviors such as hand-washing and locking doors were frequent disruptions. (Id.).

### b. Treatment History

Treatment records from Hamot Medical Center in Erie, Pennsylvania show that Plaintiff was seen in the emergency room on May 4, 2005, due to a panic attack. (R. at 196-98). Hospital staff noted that Plaintiff had been diagnosed with OCD at a young age, but stopped taking his prescribed medication when he was seventeen years old. (Id.). Since that time, he experienced intermittent, increasing panic attacks. (Id.). Plaintiff claimed that the attacks left him paralyzed with an impending sense of doom. (Id.). He was observed to be nervous and anxious. (Id.). Plaintiff was diagnosed with panic disorder, anxiety, and OCD. (Id.). Xanax was prescribed for treatment of his symptoms when they appeared, but not for chronic use. (Id.). He was set up with a case manager for follow-up care, and was advised to seek treatment with a psychiatrist and counselor. (Id.).

The medical record shows that Plaintiff began individual outpatient therapy and received prescription medication from Safe Harbor Behavioral Health ("Safe Harbor") in Erie, Pennsylvania in August 2004 under the supervision of Liberty Eberly, D.O. (R. at 235, 245). While seeking treatment at Safe Harbor, Plaintiff was often noted as presenting with anxiety, panic, and OCD, evidenced by occasional panic attacks, fear of social situations, and intrusive

thoughts. (R. at 200-01, 203, 205, 207, 211, 213, 217-22, 232-33, 243-44). Plaintiff also endorsed feelings of depression. (Id.). Yet, he was also considered to be friendly and cooperative, and he typically exhibited stable mood and broad affect. (Id.).

As treatment continued, Plaintiff's complaints and concerns decreased. (Id.). His medications progressively improved his mental condition. (Id.). He was able to cut back on his use of Xanax without any side effects. (R. at 207). He abstained from using alcohol following an eight day detoxification program on August 26, 2006, and regularly attended Alcoholics Anonymous meetings. (R. at 203, 205, 207, 211, 213). Plaintiff enjoyed riding his motorcycle, and occasionally helped his father with his real estate business. (R. at 203, 205). Plaintiff's diagnoses included major depressive disorder, panic disorder without agoraphobia, and alcohol dependence. (R. at 200-01, 203, 205, 207, 211, 213, 217-22, 232-33, 243-44). Plaintiff's global assessment of functioning[3] ("GAF") scores ranged between 45 and 75, progressively improving over time. (Id.).

---

[3] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

Dr. Eberly noted that Plaintiff was cared for by his father. (R. at 201-02). Plaintiff's father described Plaintiff's history of mental disorder and functional limitations to Dr. Eberly. (Id.). Plaintiff's father was frustrated that Plaintiff was not awarded social security benefits. (Id.). However, Dr. Eberly informed the father that Plaintiff should not be on long-term disability unless Plaintiff was more actively engaged in treatment; Plaintiff was not helpless and could be empowered to take care of himself. (Id.). Dr. Eberly noted that Plaintiff "seems capable of going back to work . . . and has skills he could be using." (R. at 203). Dr. Eberly felt that without more active engagement in therapy to flesh out the true extent of Plaintiff's limitations, there was nothing to indicate that Plaintiff was incapable of returning to work. (Id.). Plaintiff discontinued treatment at Safe Harbor shortly thereafter – around January 2010. (R. at 245).

Glenn Bailey, Ph.D. performed a psychological evaluation of Plaintiff on April 6, 2010 on behalf of the Bureau of Disability Determination. (R. at 255-67). Dr. Bailey diagnosed cocaine abuse in remission, alcohol dependence in remission, OCD, and panic attacks. (Id.). Plaintiff received a GAF score of 50. (Id.). Functionally, Plaintiff was considered likely to experience marked limitation responding appropriately to work pressures in a usual work setting. (Id.). Plaintiff would be moderately limited when interacting appropriately with supervisors and co-workers, as well as when responding to changes in a routine work setting. (Id.). Plaintiff was not otherwise limited as a result of his diagnosed impairments. (Id.).

As support for his conclusions, Dr. Bailey noted Plaintiff's extensive history of mental illness and difficulty in school as a child and teenager. (Id.). Plaintiff reported significant OCD behaviors that interfered with daily activities. (Id.). Plaintiff had substantial cocaine and alcohol consumption between the ages of seventeen and twenty-seven. (Id.). Plaintiff thereafter abstained from substance abuse, and engaged in therapy. (Id.). However, Dr. Bailey recounted

5

that Plaintiff quit therapy at Safe Harbor due to his disagreement with treatment methods. (Id.). Plaintiff now sought treatment solely from his primary care physicians. (Id.). He still attended Alcoholics Anonymous. (Id.).

Upon examination, Dr. Bailey noted that Plaintiff appeared to be well-groomed and neatly dressed. (Id.). Plaintiff was pleasant and cooperative. (Id.). He exhibited obsessive thoughts and behaviors, his impulse control was inconsistent, and his social judgment was questionable, but his thoughts were goal-directed and relevant, he spoke clearly and concisely, he had no thought disturbances, his abstract thinking was intact, his intelligence was above average, his insight was good, his concentration was good, and he was able to keep up with regular activities of daily living. (Id.).

A Mental Residual Functional Capacity Assessment ("RFC") was performed by state agency evaluator Arlene Rattan, Ph.D. on April 9, 2010. (R. at 268-70). She diagnosed Plaintiff with anxiety-related disorders and substance addiction disorders. (Id.). Plaintiff was determined to be only moderately to not significantly limited in all aspects of functioning. (Id.). Dr. Rattan concluded that Plaintiff was capable of engaging in full-time work. (Id.). She reasoned that the medical record revealed that Plaintiff's substance abuse was in remission, that he was capable of performing simple, routine, repetitive work in a stable environment, and that he could make simple decisions, ask simple questions, accept instruction, and sustain an ordinary routine without special supervision. (Id.). Dr. Rattan gave Dr. Bailey's opinion significant weight, but considered his more severe findings to be an overestimation of Plaintiff's limitations. (Id.).

Following his time at Safe Harbor, Plaintiff was primarily treated for his mental disorders by physicians Jeffrey Start, D.O. and Erik Esper, D.O. The record contains treatment notes from Dr. Start from June 7 and 13, 2005, December 1 and 12, 2005, December 8, 2010, and January

6

13, 2011, April 7, 2011. (R. at 311 – 23). These records most often noted that Plaintiff suffered from OCD, anxiety, and depression, and he was easily stressed. (Id.). Plaintiff's substance abuse had been a significant contributor to his problems. (Id.). Plaintiff was provided with prescription medication. (Id.). Plaintiff was also consistently advised to engage in counseling. (Id.). Failure to do so was noted as a significant barrier to Plaintiff's success. (Id.). Dr. Start did not believe that Plaintiff was capable of working. (Id.).

On January 13, 2011, Dr. Start completed a Mental Medical Source Statement. (R. at 307-12). The statement contained diagnoses of OCD, dependent personality disorder, and alcohol dependence in remission. (Id.). Dr. Start believed that in light of past failures to adequately treat Plaintiff's disorders, Plaintiff was unable to engage in full-time employment. (Id.). Plaintiff was found to have serious limitation to no useful ability to function in terms of: maintaining attention for a two hour segment, maintaining regular attendance and punctuality, working in coordination with or proximity to others, completing a normal workday and workweek, performing at a consistent pace, asking simple questions or requesting assistance, accepting instruction and criticism, getting along with co-workers or peers, dealing with normal work stress, setting realistic goals and making independent plans, interacting with the general public, maintaining socially appropriate behavior, traveling in unfamiliar places, and using public transit. (Id.). Plaintiff was likely to miss four or more days of work per week. (Id.). He could not manage benefits in his own best interest. (Id.).

Dr. Esper treated Plaintiff on approximately six occasions between August 28, 2008 and June 17, 2010. (R. at 295-301). Dr. Esper counseled Plaintiff during their sessions, but Plaintiff only mentioned psychological issues on four occasions. (Id.). Dr. Esper noted that Plaintiff had struggled with alcohol abuse and OCD-related symptoms. (Id.). While Plaintiff's appearance

7

was generally good, Dr. Esper felt that Plaintiff was incapable of working, and that day-to-day functionality was problematic. (Id.).

### c. Administrative Hearing

At his hearing, Plaintiff testified that although he had worked a number of full-time jobs, he ultimately left the work force because he had extreme panic attacks. (R. at 35-36). Working around other people made him nervous. (R. at 39). He preferred to avoid public transit. (R. at 41). Plaintiff rarely left his home on his own, and only occasionally with his father to go to the store. (R. at 38). He did not feel that he would be able to survive without his father's help. (R. at 41). Plaintiff spent most of the day watching television and playing video games. (R. at 33). He claimed to have difficulty remaining in one place for long, even in his home. (R. at 33).

Following Plaintiff's testimony, the ALJ posed hypothetical questions to a vocational expert. The ALJ began by asking whether a hypothetical individual of Plaintiff's age, educational level, and work background would be capable of engaging in work at any exertional level, if limited to jobs involving only isolated, simple, routine, one/two-step work, low stress, no production rate or quotas, only occasional changes in the work setting, only occasional decision making, and only occasional supervision or interaction with the public or co-workers. (R. at 45-46). The vocational expert responded that such a person would be capable of working in job categories including "bench assembly" and "fabricator," with approximately 76,000 available positions in the national economy, "general office clerks" and "document preparers," with 100,000 positions available, and "building cleaners," with 1.4 million available positions. (R. at 46). The ALJ subsequently inquired whether the same hypothetical person would still be able to find full-time work if he or she would be off-task twenty-five percent of any given work day. (R.

at 46-47). The vocational expert replied that such a person would not be able to engage in substantial gainful activity. (R. at 47). The vocational expert went on to state that if such a person were absent more than once per month, he or she would be unable to find full-time work. (R. at 47). Requiring breaks or rest periods beyond fifteen minutes in the morning, thirty or forty minutes for lunch, and fifteen minutes in the afternoon, would also preclude employment. (R. at 47).

### B. ANALYSIS

#### 1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); Brewster v. Heckler, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R.

§404.1520(a)(4); see Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; Schaudeck v. Comm'r Soc. Sec., 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. See 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Ventura v.

---

[4]

Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5]

Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

10

Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. Palmer v. Apfel, 995 F. Supp. 549, 552 (E.D. Pa. 1998); S.E.C. v. Chenery Corp., 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. Chenery, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986).

### 2. **Discussion**

The ALJ determined that Plaintiff suffered severe medically determinable impairments in the way of OCD, panic attacks, and a history of poly-substance abuse. (R. at 16). In spite of these impairments, Plaintiff was found capable of working jobs at all exertional levels, but involving only simple, routine work with only one or two steps and low stress, only occasional changes in the work setting, only occasional work related decision making, only occasional interaction with the public or co-workers, only occasional supervision, an isolated setting, and not including production pace or quotas. (R. at 17). Based upon this RFC assessment, and considering the testimony of the vocational expert, the ALJ concluded that Plaintiff was able to

11

engage in substantial gainful employment in significant numbers in the national economy, and was not entitled to DIB or SSI as a consequence. (R. at 21-22).

Plaintiff objects to the determination of the ALJ, arguing that the ALJ erred by failing to formulate a proper hypothetical question and RFC assessment, and by failing to accord the opinions of Drs. Start and Esper appropriate weight. (ECF No. 9 at 1, 3). According to Plaintiff, the ALJ's decision was not, therefore, supported by substantial evidence. (ECF No. 9). The court notes that when rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981) (citing Chenery, 318 U.S. at 94). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000); Cotter, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

### a. Treating Physicians

The court first addresses Plaintiff's argument regarding the treatment of Drs. Start and Esper's medical opinions. The Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." Brownawell v. Comm'r of Soc. Sec., 554 F. 3d 352, 355 (3d Cir. 2008) (quoting

Morales v. Apfel, 225 F. 3d 310, 317 (3d Cir. 2000)); Plummer v. Apfel, 186 F. 3d 422, 429 (3d Cir. 1999) (citing Rocco v. Heckler 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. Id.

While it is not expected that the ALJ's explanation match the rigor of "medical or scientific analysis" a medical professional might provide in justifying his or her decisions, it is expected that when rejecting a treating physician's findings or according such findings less weight, the ALJ will be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. Cotter, 642 F. 2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." Fargnoli v. Massanari, 247 F. 3d 34, 42 (3d Cir. 2001). The ALJ "cannot reject evidence for no reason or for the wrong reason." Morales v. Apfel, 255 F. 3d 310, 317 (3d Cir. 2000) (citing Mason v. Shalala, 994 F. 2d 1058, 1066 (3d Cir. 1993)). Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. Id. at 318-19; Daring v. Heckler, 727 F. 2d 64, 70 (3d Cir. 1984). However, the determination of disabled status for purposes of receiving benefits – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).

The ALJ downplayed the significance of Drs. Start and Esper's findings due to the minimal record of treatment by these medical sources, particularly when compared to Plaintiff's treatment record while at Safe Harbor. (R. at 18-20). Plaintiff's well-being was sharply distinguishable when actively engaged in treatment at Safe Harbor, as opposed to what may be

characterized as sporadic treatment – at best – with Drs. Start and Esper. (Id.). Dr. Start and Dr. Esper's opinions provided little in the way of objective evidence of Plaintiff's limitations, beyond Plaintiff's own complaints. (Id.). If anything, it is the record from Safe Harbor that most reflects "continuing observation of the patient's condition over a prolonged period of time," upon which the ALJ was entitled to rely, and with which the ALJ was able to provide evidence contradicting Drs. Start and Esper's conclusions. Brownawell, 554 F. 3d at 355.

Dr. Bailey's findings also largely contradicted those of Drs. Start and Esper. (Id.). While not based upon a longstanding treatment history, Dr. Bailey's more mild findings were in accord with those in the records of Safe Harbor. (R. at 18-20). Incidentally, the court realizes that the ALJ did not give full credit to Dr. Bailey's findings as they pertained to Plaintiff's marked limitation responding to pressures in the usual work setting. (Id.). Nevertheless, Plaintiff fails to explain how this finding – even if accurate – was not accommodated by the ALJ in his hypothetical and RFC assessment when he provided that the jobs should not involve production pace or quotas, or anything beyond simple, routine, "low stress" work in an isolated environment. (R. at 17). The ALJ also properly bolstered his conclusions by relying upon the findings of state agency evaluator Rattan. (R. at 18-20).

In cases such as this, involving conflicting medical conclusions, "the ALJ is not only entitled but required to choose between them." Cotter, 642 F. 2d at 705. Presently, the ALJ did so, and provided a well-reasoned rationale. However, Plaintiff also attacks the sufficiency of the ALJ's explanation due to a failure to fully discuss all GAF scores on record – particularly those scores of 40 assessed by Dr. Start. The ALJ did discuss how Plaintiff's GAF scores improved over time with consistent treatment at Safe Harbor. (R. at 18-20). The ALJ also acknowledged that the findings regarding Plaintiff's mental state worsened significantly when he left Safe

14

Harbor and received sporadic treatment from Drs. Start and Esper. (Id.). While Dr. Start's GAF scores were not explicitly mentioned, the ALJ otherwise discussed his findings. (Id.). Further, Plaintiff fails to indicate how the explicit inclusion of Dr. Start's GAF scores in the ALJ's decision would have altered the outcome of the decision.

A "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." Gilroy v. Astrue, 351 Fed. App'x 714, 715-16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)). While GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability. Coy v. Astrue, 2009 WL 2043491 at *14 (W.D. Pa. July 8, 2009) (citing Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008)). Given the ALJ's otherwise thorough discussion of Plaintiff's medical history and the notes wherein the GAF scores were provided, the court finds that the ALJ's discussion does not constitute error requiring remand. See Coy, 2009 WL 2043491, *14 ("The failure to mention the scores specifically does not constitute reversible error. The Court declines plaintiff's invitation to remand solely so the ALJ can insert the GAF scores into his decision.").

#### b. Hypothetical Question

The court now addresses Plaintiff's contention that the ALJ relied upon an improper hypothetical question when denying DIB and SSI. Plaintiff asserts that the ALJ erred in failing to include the limitation that Plaintiff would be off-task at work approximately twenty-five percent of any given work day. (ECF No. 9 at 1). As support, Plaintiff first argues that at Step 2 the ALJ found that Plaintiff had a severe impairment in the way of maintaining attention and

15

concentration. (ECF No. 9 at 3). A simple reading of the ALJ's decision shows that this is not correct:

> The claimant has the following severe impairments: obsessive-compulsive disorder, panic attacks, and a history of poly-substance abuse.

(R. at 16). The ALJ goes on to say that the above severe impairments limit Plaintiff's ability to perform basic work activities including "maintaining attention and concentration," not that Plaintiff's ability to maintain attention and concentration was itself a severe impairment. (Id.).

Further, the ALJ's analysis at Step 2 to determine whether or not an alleged impairment is "severe," is no more than a "*de minimis* screening device to dispose of groundless claims." Magwood v. Comm'r of Soc. Sec., 417 Fed. App'x 130, 132 (3d Cir. 2008) (quoting Newell v. Comm'r of Soc. Sec., 347 F. 3d 541, 546 (3d Cir. 2003)). Impairment is not "severe" where the record demonstrates only "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" Id. As such, the ALJ here is stating only that Plaintiff's impairments have more than a "minimal effect" on his ability to maintain attention and concentration. This does not equate to a belief by the ALJ that Plaintiff would be off-task at work twenty-five percent of the day.

With respect to the next components of Plaintiff's argument – that one of the ALJ's hypotheticals at the administrative hearing included the twenty-five percent off-task limitation, and that the vocational expert explained that with such a limitation no work was available – the ALJ is not required to adopt hypotheticals that he or she may pose to a vocational expert. Simply because a hypothetical was posed, does not mean that there was sufficient evidence to support it; the ALJ ultimately relies upon only credible, medically established limitations. Rutherford v. Barnhart, 399 F. 3d 546, 554 (3d Cir. 2005) (citing Plummer, 186 F. 3d at 431).

Plaintiff points to no evidence which established the existence of such a limitation in his ability to maintain attention and concentration. As discussed by the ALJ, the evidence did not support the existence of more than moderate limitation in this regard. (R. at 16-17). Further, Plaintiff fails to detail how his moderate limitation was not adequately accommodated by the ALJ's provision that available jobs must not require more than simple, routine work involving tasks with no more than one or two steps. (R. at 17).

### **III.** CONCLUSION

Based upon the foregoing, the ALJ provided sufficient justification from the medical record and Plaintiff's personal testimony to allow this Court to conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied and that Defendant's Motion for Summary Judgment be granted. The decision of the ALJ should be affirmed.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file objections will waive the right to appeal. Brightwell v. Lehman, 637 F. 3d 187, 193 n. 7 (3d Cir. 2011).

S/Susan Paradise Baxter  
SUSAN PARADISE BAXTER  
United States Magistrate Judge

Date: June 13, 2012

cc: The Honorable Sean J. McLaughlin
United States District Judge